849 F.2d 610
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Deborah TILLMAN, Plaintiff-Appellant,
v.
PEPSI-COLA METROPOLITAN BOTTLING COMPANY, INC., Defendant-Appellee.
 No. 87-1474.
 United States Court of Appeals, Sixth Circuit.
 June 14, 1988.
 
 Before KEITH, BOYCE F. MARTIN Jr., and DAVID A. NELSON, Circuit Judges.
 PER CURIAM.
 
 
 1
 Plaintiff Deborah Tillman, a black female, sued defendant Pepsi-Cola Metropolitan Bottling Company under Michigan's Elliott-Larsen civil rights act, M.C.L.A. Secs. 37.2101 et seq, for alleged discrimination because of sex and/or race. The district court entered summary judgment in favor of defendant Pepsi, and Ms. Tillman appealed. We shall affirm the judgment.
 
 I.
 
 2
 In May of 1976 Ms. Tillman began working for Pepsi as a merchandiser at the company's Warren plant in Detroit, Michigan. In this capacity Ms. Tillman had responsibility for maintaining Pepsi displays in various stores that sold the company's products. Ms. Tillman was the first woman to be hired by Pepsi for this position.
 
 
 3
 In 1979 Pepsi promoted Ms. Tillman to the position of Account Driver Supervisor at the Warren plant. In this job she supervised Pepsi's drivers on a specific inner city route. The Warren plant had a number of routes, some of which were in the inner city and others of which were in the suburbs. Ms. Tillman's route had a high incidence of crime, and during her tenure in the supervisor position Ms. Tillman witnessed--or was herself the victim of--various crimes and incidents of offensive behavior.
 
 
 4
 During 1982 Ms. Tillman sought a transfer to a less dangerous route. Other routes became available after she first made this request. But Pepsi gave each one to a newly-hired supervisor. Pepsi told Ms. Tillman that it was turning down her request because of her good rapport with the drivers and customers of her route. Pepsi had no formal policy with regard to transfers between routes, and during Ms. Tillman's time as a supervisor the company made only two such transfers. Each was a transfer from one inner city route to another. Neither transfer was made for the benefit of the individual who was transferred, and each of the supervisors concerned had a job performance rating of "commendable plus." Ms. Tillman's was "commendable"--the average job performance rating.
 
 
 5
 In December of 1982 or January of 1983 Ms. Tillman quit her job--she says involuntarily. She maintains that the psychological pressure of working in the crime-ridden inner city made the prospect of her continued employment there intolerable.
 
 II
 
 6
 The district court held that Pepsi was entitled to summary judgment on Ms. Tillman's claim that the company's refusal to transfer her was improperly discriminatory. The court held that there was no genuine issue as to whether Pepsi had an illegal motive. Ms. Tillman contends that this holding was erroneous.
 
 
 7
 First, she relies on the rebuttable inference often applied in cases brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. Secs. 2000e et seq. See McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973). Ms. Tillman points out that she is a member of a protected class, she applied for a transfer, she was denied a transfer in spite of openings to which she could have been transferred, and she was qualified to do the job to which she requested transfer.
 
 
 8
 Under the McDonnell-Douglas approach, however, a person complaining of the denial of a transfer would have to show either that the employer had a policy of making such transfers on the basis of criteria which the complainant satisfied or that the position sought by the complainant was filled by one not a member of a protected class. (In the prototypical case, of course, an employer looking for a new employee passes over a qualified candidate from a protected class only to leave open the position or hire a candidate who is no better qualified and who is not a member of a protected class.) Ms. Tillman made no such showing.
 
 
 9
 Ms. Tillman points to the treatment accorded a white male named Al Dehartogh, but we cannot see that this helps her in any way. The record reflects that on July 19, 1982, Pepsi promoted Mr. Dehartogh to a position as "checker." Before receiving the promotion Mr. Dehartogh had been given merit pay increases each year from 1976 to 1980, but had been denied such an increase in 1981. In July of 1983 he was demoted back to the position of supervisor. Contrary to Ms. Tillman's suggestion, Mr. Dehartogh's employment history does not show the existence of any policy regarding transfers of supervisors between routes, and Mr. Dehartogh received no such transfer.
 
 
 10
 Ms. Tillman next argues that each of the two people to whom at different times she reported had a discriminatory attitude. As to the first of these individuals, Ms. Tillman testified at her deposition that two of Pepsi's drivers told her he had made bigoted remarks. This is hearsay evidence, and it is not competent to show bias.
 
 
 11
 Ms. Tillman also testified that at the time she was being considered for promotion to her position as supervisor this same individual said that he didn't believe a woman could do the job. The fact remains, however, that he did promote her. His comment was made some three years before the transfer request, and it can hardly support an inference that her sex had anything to do with the company's refusal to transfer her to a job that she thought would be easier for her.
 
 
 12
 Ms. Tillman's second superior is taken to task for a passing comment he made to her when the two met accidently in a suburban shopping mall. We do not know when this meeting occurred. The comment could be construed to reflect surprise at seeing Ms. Tillman such a great distance from her home, but Ms. Tillman attributed it to a discriminatory state of mind. If so, the connection to the denial of Ms. Tillman's request for a transfer seems too tenuous to justify a reversal of the district court's decision.
 
 
 13
 Ms. Tillman's last category of circumstantial evidence is statistical in nature. She says that Pepsi has hired only three women as account driver supervisors, and each was given an inner city route. She maintains that of the eight blacks in these positions, all were placed in inner city routes initially, one subsequently being promoted to a suburban route.
 
 
 14
 The record does not support Ms. Tillman's claim that blacks were assigned only to inner city routes. Pepsi's response to an interrogatory shows that during the relevant time period five out of nine black supervisors were assigned to routes outside a region designated the "Central" region. Although it may be that routes outside the Central region were inner city routes, we have no way to know this. We do know that Ms. Tillman was assigned to an inner city route, and this interrogatory response shows that Ms. Tillman's route was in the Central region; more we cannot say. The burden to develop the statistical record was Ms. Tillman's, and if some of the non-Central region routes were in the inner city, she ought to have demonstrated that fact. Her failure to do so undermines the probative value of her statistics.
 
 
 15
 The record does show, as Ms. Tillman contends, that all three female supervisors were assigned to routes in the Central region. Standing alone, however, that datum is not suggestive of any illegal discrimination. The undisputed record shows that Pepsi had no transfer policy under which Ms. Tillman ought to have been transferred, and there is no significant evidence, direct or circumstantial, that the company refused to transfer Ms. Tillman because of her sex or race.
 
 III
 
 16
 Ms. Tillman argues that although Pepsi's failure to adopt a transfer policy is neutral on its face, that failure had an undue adverse impact on women. We are not persuaded. The argument assumes, as we may not, that employment in the inner city is more psychologically harmful to women than it is to men. The argument also assumes that all three women were purposefully assigned to inner city routes when they could just as well have been assigned to more desireable routes elsewhere--a fact that the record does not show. The disparate impact doctrine has no application here. See Lynch v. Freeman, 817 F.2d 380 (6th Cir.1987).
 
 IV
 
 17
 Ms. Tillman's last argument is that she was constructively discharged. Even if that were true, it would not necessarily follow that Pepsi discharged her because of her sex or race. In any event, as we understand it, Ms. Tillman is suggesting that Pepsi ought to have transferred her because the conditions of her employment were too onerous for her personally. The constructive discharge doctrine, however, requires an inquiry into whether the conditions of employment were objectively intolerable, not whether a particular employee could tolerate them less easily than another employee. Kreis v. Charles O. Townley, M.D. & Associates, P.C., 833 F.2d 74, 81-82 (6th Cir.1987).
 
 
 18
 The judgment of the district court is AFFIRMED.